

U.S. Department of Justice

United States Attorney
Eastern District of New York

271 Cadman Plaza East
Brooklyn, New York 11201

FJN/RMP:AA/LAB
F. #2009R01065/OCDETF#NY-NYE-616

September 12, 2024

By ECF and E-Mail

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Ismael Zambada García, et al.
Criminal Docket No. 09-466 (BMC)

Dear Judge Cogan,

For well over three decades, the defendant Ismael Zambada García, also known as "El Mayo" and "Mayo Zambada," has been one of the most prolific and powerful narcotraffickers in the world. Together with his co-defendant, Joaquín Guzmán Loera, also known as "El Chapo," the defendant was a co-founder in the late 1980s of the brutally violent Sinaloa Cartel (the "Cartel"), and he has reigned ever since—until just a few weeks ago—as one of its principal leaders. The defendant is scheduled to appear before United States Magistrate Judge James R. Cho on September 13, 2024 at 10 a.m., for an arraignment on a fifth superseding indictment returned in this district. For the reasons set forth below, no condition or combination of conditions of release can assure the safety of the public or the defendant's appearance at trial, and the government respectfully submits that the Court should therefore enter a permanent order of detention pursuant to Title 18, United States Code, Section 3142(e).

I. Background

The defendant has been indicted no fewer than 16 times over the past two decades in districts across the United States—his first indictment in this district was in 2009, and a fifth superseding indictment against him was returned on February 15, 2024 (the "EDNY Indictment"). ECF. Nos. 1, 720.[1] On July 25, 2024, he was arrested at Santa Teresa Airport in

---

[1] Other unsealed federal indictments and superseding indictments against the defendant have been pending in the District of Colombia since 2003 (No. 1:03-cr-34 (DDC)); the Northern District of Illinois since 2009 (No. 1:09-cr-383 (NDIL)); the Western District of Texas since

Doña Ana County, New Mexico (a district where no charges were pending against him), and was subsequently presented and arraigned on a 2012 indictment pending in the neighboring Western District of Texas, in El Paso. See United States v. Ismael Zambada García, No. 3:12-cr-849 (WDTX), ECF No. 1283-1287. The defendant was ordered detained. See id. Proceedings there have been stayed and speedy trial time excluded pending resolution of the prosecution here. See id. at 1335.

### A. Mayo Zambada's Role as a Co-Founder and Leader of the Sinaloa Cartel for the Past Four Decades

As a co-founder and principal leader of the Cartel, the defendant is one of the world's most notorious and dangerous drug traffickers. His rise to power began with the Cartel's inception and ended with his arrest in July 2024. Previously known as the Mexican Federation, the Cartel is a drug trafficking organization based in Sinaloa, Mexico, that has since approximately the late 1980s imported lethal quantities of narcotics—including, inter alia, cocaine, heroin, methamphetamine, and, more recently, fentanyl—into the United States and laundered billions of dollars in drug proceeds back to Mexico. The defendant and El Chapo—who was captured in 2016, and later extradited and convicted in the EDNY in 2019[2]—formed a partnership that led to the transformation of the Sinaloa Cartel into one of the largest drug trafficking organizations in the world.[3] From the start of their rise to power several decades ago, they blazed a path of extraordinary violence that would become a hallmark of the Cartel. As the defendant and El Chapo joined forces, they entered bloody battles with rival groups, including the Arellano Felix drug trafficking organization, for control of the Tijuana-area of Mexico.

At the defendant's and El Chapo's direction, the Cartel's operations initially focused on cocaine distribution based on cooperative arrangements and close coordination with South American sources of supply and distribution networks. This changed in the 2000s when the Colombians, seeing increased law enforcement activity, started to abandon their United States distribution businesses in favor of permitting Mexican traffickers to invest in cocaine shipments at wholesale prices, which those Mexican traffickers would then distribute in the United States. As a result, Mexican traffickers and the Cartel began to take a more integral role in moving cocaine from Colombia into and throughout the United States. Filling a vacuum left

---

2012 (No. 3:12-cr-849 (WDTX)); the Southern District of California since 2014 (No. 3:14-cr-658 (SDCA)); and the Central District of California since 2015 (No. 2:15-cr-566 (CDCA)).

[2] El Chapo was convicted following an eleven-week jury trial in February 2019 before the Court. The Court later sentenced El Chapo to a term of life imprisonment plus 30 years and ordered him to pay $12.6 billion in forfeiture. The Second Circuit affirmed the conviction and sentence in all respects.

[3] This partnership also originally included Arturo and Héctor Beltrán Leyva, Ignacio "Nacho" Coronel Villarreal—all now deceased—and the defendant's younger brother, Jesús "El Rey" Zambada, who pleaded guilty and testified as a government witness at the trials of El Chapo and corrupt former Mexican Secretary of Public Security Genaro García Luna.

by the departing Colombian traffickers, the Cartel established distribution networks across the United States, including in New York.

Drug seizures traced to the Cartel in New York City and throughout the United States—including those specifically enumerated in the EDNY Indictment, among countless others—have become routine. Ever since the Cartel's expansion into the United States, its distribution networks have also supported money laundering efforts that have delivered billions of dollars in illegal profits generated from drugs sales in the United States back to the Cartel. Increased profits allowed the Cartel's operations to grow a large-scale narcotics transportation network involving the use of land, air, and sea transportation assets, which eventually led to the Cartel shipping multi-ton quantities of cocaine from South America, through Central America and Mexico, and finally into the United States. For many years, the Cartel has used this infrastructure to target the United States with distribution of cocaine and other drugs, including heroin, methamphetamine, and, since at least 2012, fentanyl.

Fentanyl is a highly addictive synthetic opioid that is approximately 50 times more potent than heroin and 100 times more potent than morphine, and it poses one of the deadliest drug threats ever faced by the United States. The Cartel's production of fentanyl has involved the purchase of fentanyl precursor chemicals from Chinese companies and the production of fentanyl in high volumes in laboratories both in rural areas and major cities in Mexico for distribution in the United States. The Cartel has distributed many thousands of kilograms of fentanyl into and throughout the United States.

The defendant has devoted his efforts over decades to growing, increasing, and enhancing the power of the Cartel—and his individual power and position in the Cartel after his partner El Chapo was captured. Under the defendant's leadership, the Cartel has regularly used violence, intimidation, and murder to silence potential witnesses and dissuade law enforcement from performing its duties. A cornerstone and central tenet of the defendant's command and control of the Cartel has been public corruption. The defendant has operated with impunity at the highest levels of the Mexican drug trafficking world while being assured of his continued success and safety from arrest through his payment of bribes to government officials and law enforcement officers. He controlled corrupt officials and officers who protected his workers and drug shipments as his drugs were transported across Mexico and into the United States. Numerous witnesses have testified, including at the trials of El Chapo and corrupt former Mexican Secretary of Public Security Genaro García Luna, that corruption at all levels was necessary to allow the defendant's criminal enterprise to function so effectively at such a large scale: from local police officers who escorted the drugs through Mexico, to corrupt officials who informed the Cartel of military actions, thwarted capture operations, and consulted with the Cartel about proceedings and investigations against it. The Cartel spent millions of dollars a year at the defendant's direction on corruption payments.

Another essential aspect of the defendant's method of control was brutal force and intimidation. The defendant maintained an arsenal of military-grade weapons to protect his person, his drugs, and his empire. His heavily armed private security forces were used as his personal bodyguards and as protection for drug shipments throughout Mexico, Colombia, Ecuador, and beyond. Moreover, he maintained a stable of "sicarios," or hitmen, who carried out

gruesome assassinations and kidnappings aimed at maintaining discipline within his organization, protecting against challenges from rivals, and silencing those who would cooperate with law enforcement. Indeed, the defendant engaged in systematic assassinations of fellow members of the Cartel, rival Cartel members, and law enforcement and military personnel who either betrayed or worked against the goals of the Cartel. He is charged with conspiring to murder members of the Cartel, members of law enforcement, and members of rival cartels as part of his continuing criminal enterprise in the EDNY Indictment.

Indeed, the Cartel under the defendant's leadership has repeatedly demonstrated its willingness to use its virtually unlimited resources to inflict violence and death in furtherance of the Cartel's goals, and the government has been able to attribute numerous acts of violence to the defendant almost as recently as his arrest. Just a few months ago, the defendant ordered the murder of his nephew Eliseo Imperial Castro, also known as Cheyo Antrax, after learning that he was collecting debts purportedly on behalf of the defendant for his own benefit and without permission. Imperial Castro was found dead in a car by the side of the road in Culiacán where he was ambushed in May of this year. In similar fashion, in approximately November 2023, the defendant directed violence in retaliation for the theft of a large cache of fentanyl pills, methamphetamine, and cocaine that belonged to the Cartel in Tijuana. To the government's knowledge, at least three people have been murdered in retaliatory violence directed by the defendant in connection with that theft.

### B. The EDNY Indictment

The fifth superseding indictment includes seventeen counts, including a death-eligible Continuing Criminal Enterprise ("CCE") charge that carries a mandatory life sentence, and it incorporates the defendant's drug trafficking activities and violence from the Cartel's inception. The CCE charge specifies 84 predicate drug violations and one predicate murder conspiracy (Count One). The indictment also charges the defendant with a drug manufacturing and distribution conspiracy involving cocaine, fentanyl, heroin, methamphetamine, and marijuana (Count Two), a cocaine importation and distribution conspiracy (Counts Three and Four), 11 substantive cocaine distribution charges (Counts Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen), a firearms charge (Count Sixteen), and a conspiracy to launder narcotics proceeds charge (Count Seventeen). In addition to the CCE charge's mandatory life sentence, the defendant faces 14 drug counts that each carry mandatory minimum sentences of 10 years' imprisonment, and a firearms count that carries a mandatory minimum sentence of 30 years' imprisonment.

## II. Mayo Zambada Should be Detained Pending Trial

### A. The Bail Reform Act and Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled

Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense or a firearms offense under 18 U.S.C. § 924(c). 18 U.S.C. § 3142(e)(3)(A),(B). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

      The presumption means that the Court must initially assume there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight. See 18 U.S.C. § 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

      The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable [ ] incentive to flee," Millan, 4 F.3d at 1046, as does the possibility of a severe sentence, see Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

      Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). Even where the defendant has met his burden of proof to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider. Mercedes, 254 F.3d at 436.

B. <u>A Presumption of Detention Applies to the Defendant Under the Bail Reform Act and Legal Precedent</u>

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, the defendant is charged with:

- an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (18 U.S.C. § 3142(e)(3)(A)); and

- an offense under 18 U.S.C. § 924(c) (18 U.S.C. § 3142(e)(3)(B)).

As such, he is presumed to pose a danger to the community and a risk of flight. Accordingly, the defendant bears the initial burden of showing that he is not a danger to the community or a flight risk. For the reasons set forth below, the defendant cannot sustain that burden.

1. <u>The Defendant Is a Clear Danger to the Community</u>

The facts and circumstances of this case compel the defendant's detention, as all four factors set forth in the Bail Reform Act inescapably show that he poses a danger to the community. The conduct with which the defendant is charged—leading a continuing criminal enterprise engaged in drug trafficking and brutal acts of violence, and participating in multiple drug conspiracies including a drug manufacturing and distribution conspiracy for cocaine, fentanyl, heroin, methamphetamine, and marijuana, a cocaine importation and distribution conspiracy, as well as cocaine distribution, money laundering, and firearm charges—includes some of the most egregious crimes contemplated by our criminal justice system. For these crimes, the defendant faces either the death penalty or a mandatory life sentence on the continuing criminal enterprise charge as well as a 30-year mandatory minimum sentence on the firearms charge and multiple 10-year mandatory minimum sentences on the other drug counts. See 21 U.S.C. §§ 848(b), 841(b)(l)(A)(ii)(II))960(b)(1)(B)(ii); 18 U.S.C. § 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

The scope and continuing nature of the defendant's decades-long criminal conduct—which include the use of bribery and violence to carry out the production, purchase, and distribution of illicit narcotics—reflect an almost unique responsibility for the steady supply of deadly drugs that flow through and around the United States, and the significantly compromised quality of life that our communities suffer as a result.

The defendant's release would pose extraordinary danger to the community given the ease with which he can continue to engage in criminal conduct by, among other things, directing Cartel members to engage in narcotics trafficking and/or violence on his behalf. See Millan, 4 F.3d at 1048 ("dangerousness" encompasses "'the danger that the defendant might engage in criminal activity to the detriment of the community'" (quoting legislative history)); Leon, 766 F.2d at 81 (dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking"). That danger is particularly pronounced here given the defendant's notorious drug trafficking activities spanning nearly four decades.

Beyond the dangerousness of his narcotics trafficking, the defendant directly oversaw and ordered numerous acts of violence and murder carried out by Cartel members, and through his direction of the Cartel, the defendant has shown a disregard for human life. The defendant has lived a life of crime and violence, and his record of ruthless criminality is extraordinary in its scope and effect. Moreover, the evidence of the defendant's guilt in leading a continuing criminal enterprise and engaging in narcotics trafficking is overwhelming. The EDNY Indictment issued earlier this year is the culmination of a decades-running investigation conducted by numerous agencies and which led to the conviction and life imprisonment of the other co-founder of the Sinaloa Cartel. The evidence supporting the charges against the defendant includes, among other things, trial-tested evidence and witnesses, intercepted communications, drug seizures, and testimony from numerous cooperating witnesses, law enforcement agents, and victims.

In sum, no combination of conditions would be sufficient to allay the extraordinary danger the defendant poses to the community.

2. The Defendant Is Clearly a Risk of Flight

Similarly, the defendant cannot overcome the presumption that he is a risk of flight. He has been under indictment for over two decades and in EDNY since 2009, and the United States offered a $15 million reward for information leading to his arrest. The defendant has evaded capture for many years. Should the defendant be released from custody, he could seek to leverage his power over Cartel members, his extensive control of smuggling routes, and his compromise of public officials to assist him in fleeing from law enforcement and evading justice in an American courtroom. See United States v. Bruno, 89 F. Supp. 3d 425, 432 (E.D.N.Y. 2015) (observing, in case involving both serious flight risk and danger to community, that detention is appropriate where defendant's "alleged ties to a large criminal syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction"). In addition, the defendant controls extensive wealth and the ability to obtain additional revenue from the Cartel's ongoing drug trafficking activities, all of which would enable him to orchestrate a flight from justice. The prospect of spending the rest of his life in prison provides a strong incentive to flee. See Jackson, 823 F.2d at 6-7; Martir, 782 F.2d at 1147 (charges with significant maximum terms created potent incentive to flee); Cisneros, 328 F.3d at 618 (seriousness of charges gave defendant strong incentive to abscond). Furthermore, even in the extraordinarily unlikely event that the defendant were to prevail in the instant case, he faces charges in five other districts across the United States. This fact provides the defendant an even greater incentive to flee.

The defendant's personal history and characteristics demonstrate that he is a significant flight risk. As described above, the defendant oversaw a large and powerful organization that routinely engaged in brutal acts of violence and drug trafficking on an unprecedented scale, and he employed an army of sicarios to exact violence on those that stood in his way. The defendant personally ordered murders. As his lifetime of notorious criminal conduct makes clear, the defendant has no respect for public authority or the rule of law. Thus, there is no reason to believe that the defendant would obey the Court's orders or conditions of release if granted bail.

III. Conclusion

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial if he were released.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Francisco J. Navarro
Francisco J. Navarro
Robert M. Pollack
Adam Amir
Lauren A. Bowman
Assistant United States Attorneys
(718) 254-7000


MARLON COBAR, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By: /s/ Melanie Alsworth
Melanie Alsworth
Kirk Handrich
Trial Attorneys


OF COUNSEL
MARKENZY LAPOINTE
United States Attorney
Southern District of Florida

By: /s/ Andrea Goldbarg
Andrea Goldbarg
Assistant United States Attorney