LAW OFFICES OF
# FRANK A. PEREZ, P. C.
ATTORNEY AT LAW

9110 SCYENE ROAD
DALLAS, TEXAS 75227

TELEPHONE (214) 828-9911
TELECOPIER (214) 828-2104

July 6, 2026

**VIA ECF AND EMAIL**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:** **United States v. Ismael Zambada Garcia**
> **Criminal Docket No. 09-CR-466(BMC)**
> **Criminal Docket No. 25-CR-262 (BMC)**

Dear Judge Cogan,

This sentencing letter is respectfully submitted on behalf of Defendant Ismael Zambada Garcia (hereinafter "Mr. Zambada" or "the defendant") to assist the Court with its decision regarding an appropriate sentence, and particularly, an appropriate recommendation for designation within the U.S. Bureau of Prisons (BOP).

*1.* *Introduction*

Defendant Ismael Zambada Garcia has pleaded guilty to Count 1 in each of the above Indictments, fully aware that the consequence will be a mandatory sentence of life imprisonment. He accepts this outcome, and does not ask the Court to sentence him outside the law.

Mr. Zambada's unequivocal acceptance of responsibility has been a defining feature of his conduct since his involuntary arrival in the United States just under two years ago. He instructed undersigned counsel to advise the Government from the earliest juncture of these proceedings that he would plead guilty, rather than entertain going to trial or any type of litigation. He filed no pre-trial motions. He did not provide substantial assistance and is not seeking now, or in the future, any motion for a reduced sentence. He has sought to be cooperative and accommodating throughout this process to the utmost of his ability. Because of the dimensions of this prosecution and everything related to it, Mr. Zambada's decision to handle the case in this way has spared the judicial system substantial cost and disruptions and has also

helped protect the safety of potential witnesses who will not need to be disclosed or called to testify.

Mr. Zambada is 76 years old and contends with a complex of age-related health issues ██████████████████ ████████████████████████. He recognizes and accepts that the sentence to be imposed by this Court will preclude any possibility of ever being released from incarceration. The request made here is that, within its ability and discretion, this Court recommend designation to a BOP facility suitably equipped to address the defendant's need for medical ████████████ treatment, such as FMC Butner, FMC Rochester, MCFP Springfield, or a similar secure medical or administrative facility within the BOP, subject in all respects to the BOP's security classification and designation authority.

Given the medical ███████████ issues documented in the record, the defense respectfully asks that those issues be expressly considered as part of the designation process, along with all security, administrative, and institutional factors BOP is required to assess. This request is consistent with the statutory designation framework. Under 18 U.S.C. § 3621(b), BOP retains authority to designate the place of imprisonment, subject to bed availability, security classification, medical and mental health needs, and other institutional considerations. The same statute expressly directs BOP to consider "recommendations of the sentencing court" and permits the sentencing court to recommend the "type of penal or correctional facility" it considers appropriate. Against this statutory background, the defense asks that the Court make a recommendation for designation to a BOP medical facility or secure medical/administrative facility capable of monitoring and treating Mr. Zambada's documented physical ██████████ conditions.

### 2. *Comments on the Presentence Report*

Defendant, through counsel, has no material objections to the factual content or guideline calculation contained in the Presentence Investigation Report (hereinafter "PSR") or its Addendum. The defense believes the Probation Office has done a thorough and professional job of summarizing the nature and circumstances of the offense, the history and characteristics of the defendant, his current health status and medical needs.

### 3. *Acceptance of Responsibility*

At every turn, Mr. Zambada has been unequivocal in his acceptance of responsibility. From the outset of these proceedings following his arrival in the United States under highly unusual circumstances (see PSR, ¶106), he made clear that he intended to resolve the case by guilty plea rather than trial.

Mr. Zambada's acceptance of responsibility has been continuous and unwavering for the past nearly two years. During his allocution at his Change of Plea hearing on August 25, 2025, he acknowledged the factual basis of his wrongdoing and expressed remorse. Similarly, he provided the following statement to the United States Probation Officer during the presentence interview process:

> I recognize the grave harm that illegal drugs have done to the people of the United States, of Mexico, and elsewhere. I also recognize the human toll of the violence and lawlessness that my criminal organization engaged in. I take responsibility for my role in all of it, and I apologize to everyone who has suffered or been affected by my actions. [See PSR, ¶142.]

The Probation Officer has correctly deducted 3 levels from the advisory guidelines pursuant to U.S.S.G. §3E1.1(a) & (b). And while this has no practical impact on the sentencing calculus due to the mandatory life term required by statute, coupled with the fact that Mr. Zambada's guidelines still substantially exceed Level 43 which correlates to life, it is nevertheless significant.

In taking full responsibility for his wrongdoing, Mr. Zambada's comportment has differed markedly from that of other foreign organized crime figures who have been brought to this country through extradition, including his former partner in the Sinaloa Cartel, Joaquin "Chapo" Guzman, who went through an 11-week jury trial seven years ago. Though Mr. Guzman had a constitutional right to maintain his innocence, the strain that it placed on court resources and personnel, and the millions of dollars in costs related to the additional security measures needed, were widely reported at the time.

In contrast, by accepting responsibility and entering a voluntary plea of guilty, Mr. Zambada:

- Avoided what would have been one of the most complex Federal trials in history;

- Spared victims and witnesses the fear and risk of being exposed and having to testify;

- Conserved substantial judicial and prosecutorial resources;

- Eliminated or greatly reduced the security concerns for all concerned that would be inherent in a protracted drug cartel litigation.

Acceptance of responsibility is one of the clearest markers of rehabilitation within the Federal sentencing tradition. It has long been held that the first essential step along the path to self-correction is to recognize and admit that one has done wrong.

By doing so, Mr. Zambada has waived not only his right against self-incrimination but any possibility to appeal or seek redress through post-conviction habeas relief. Instead, he has submitted himself to the jurisdiction of this Court.

4. *Nature and Circumstances of the Offense*

Mr. Zambada acknowledges that the magnitude, scope, and duration of his involvement with illegal drug distribution, along with the violence that permeated it and the organizer/leader role he occupied, place his criminal conduct at the very highest level of severity.

5. *History and Characteristics of the Defendant*

Pursuant to 18 U.S.C. § 3553(a)(1), the Court may consider not only the nature and circumstances of the offense, but also the history and characteristics of the defendant. That history does not diminish the gravity of the crimes to which Mr. Zambada has pleaded guilty; rather, it is offered to provide relevant background.

Ismael Zambada was born on January 30, 1950 to a family of subsistence farmers in an isolated rural community in Sinaloa, Mexico. He was the second of seven children, and the first son. He attended three years at the local village school, which was as high as it went, and then went to live with his grandmother in the city of Culiacan where he attended grades 4 through 6. On weekends and in summers, he returned to the village to work alongside his father on their farm.

When the defendant was 12 years old, his father died of brain cancer. He received no further schooling after that because, as the oldest male, he was needed to keep the farm running and help make sure the younger children were fed.

Mr. Zambada believes that if his father hadn't died, he likely would have gone farther in school. However, he was familiar with the labors associated with the farm, since he'd been helping his father since early childhood, and he needed to fulfill that role.

Beginning around the age of 15, the defendant began working for his father's brother who operated a butcher shop in a nearby town. He worked as a driver picking up and delivering meat, and he began to learn his uncle's trade while continuing to plant corn and tend livestock on his family's farm.

While working for his uncle delivering meat, Mr. Zambada met his future wife Rosario Niebla who was employed at the local sugar refinery. They married and started their family in 1968, when he was eighteen.

Mr. Zambada was introduced to the drug trade a year later when he was nineteen by a slightly older friend who took him up to the mountains about an hour from their village where each planted marijuana, camouflaging it within rows of corn on the same parcel. He recalls that the first cycle wasn't very successful, though he was able to harvest around 60 pounds which he sold to another man, receiving approximately 180 pesos per kilo (about $15 USD per kilo based on the exchange rate at the time). He continued to plant corn and other crops and raise livestock, but the following season he planted a slightly larger amount of marijuana and continued with this pattern in successive years, typically harvesting more marijuana each season than he had the one before.

From these origins, Mr. Zambada began to meet and establish friendships with other Sinaloans involved in the marijuana and opium trade. Gradually, over the course of many years, he rose to become one of the dominant figures in drug trafficking, first in Sinaloa and ultimately in Mexico as a whole. This rise to leadership evolved over numerous decades and was not foreseen by the defendant or others. (See the Probation Officer's summary of his interview with Defendant's daughter Teresa Zambada, who observed that "the defendant did not 'aspire to become what he became to that magnitude,'" PSR, ¶199.)

As indicated in the Presentence Report, the defendant's marriage to his first wife Rosario Nieba, which produced five children, ended after around 20 years. A series of relationships with other women ensued, some of which overlapped. Mr. Zambada has a total of 16 children ranging in age from 6 to 55. To the best of his ability, he strived to maintain ties with each of them.

6.     *Defendant's Physical Health*

Mr. Zambada has been diagnosed with numerous health conditions and injuries which are summarized in the Presentence Report at ¶¶201-203



Most of the above conditions are progressive and likely to exacerbate as the defendant ages. He will need ongoing access to medical care, and it is requested this be considered in assessing an appropriate designation.







Second, we are not asking for a low-security facility or special treatment. If BOP determines that Mr. Zambada's security profile requires a secure medical or administrative setting, that is within the BOP's authority. But the medical issue should not be disregarded simply because the allegations to which the defendant has pleaded are serious. The sentence to be imposed should be carried out in a manner consistent with the BOP's standard obligation to provide appropriate medical care to every prisoner in its custody.

8.     *The Issue of Parity with Co-Defendants*

Mr. Zambada's offense is at the uppermost tier of severity, as he readily acknowledges. This is one of the reasons he quickly agreed to plead to a life sentence that leaves no hope for release.

18 U.S.C. §3553(a)(6) addresses "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." It is understood few if any individuals are comparable to Mr. Zambada when it comes to seriousness of criminal conduct; however, one person who is comparable underwent prosecution in this courtroom, co-defendant Joaquin "Chapo" Guzman. Mr. Zambada and Mr. Guzman were partners in the Sinaloa Cartel for many years, and it could be argued both men's involvement in the distribution of illegal substances was so extensive that any small difference in their level of culpability would be "a distinction without a difference."

Yet, without in any way intending to deprecate the gravity of Mr. Zambada's crimes, the record reflects that of the two men, Ismael Zambada was known to first seek out other solutions to try to maintain the peace. In fact, it was precisely the opportunity to act as a mediator to resolve ongoing differences between leading elected officials in his home state of Sinaloa that was used as the "bait" to lure Mr. Zambada to the meeting on July 25, 2024 where he was beaten, tied up, abducted, driven to a waiting private aircraft, and brought to the United States by Joaquin Guzman Lopez, the son of Chapo Guzman.[3]

---



If the variances between Chapo Guzman and Ismael Zambada's offense conduct are too subtle to distinguish them in any meaningful way, however, the differences in each man's response to being charged by the United States justice system could not be more stark.

Chapo Guzman chose to:

- Deny all guilt;

- Put the government and court system through an 11-week trial -- requiring the presentation of some 30 cooperating witnesses, millions of dollars in added court and security costs, the creation of a media spectacle, and at times the disruption of motor vehicle traffic in a way that affected the daily lives of New York City commuters;

- Appeal his conviction; and

- Continue to adopt a defiant and oppositional stance, repeatedly complaining about conditions of confinement and filing post-conviction motions and writs;

In marked contrast, Mr. Zambada:

- Pleaded guilty in two separate indictments to the charges requested by the U.S. Attorney's Office, knowing it would mean a sentence of life imprisonment without any prospect for release;

- Waived any and all rights to appeals, writs, habeas proceedings, or any other type of post-conviction relief;

- Spared the Department of Justice, Federal law enforcement agents, and the judicial system millions (perhaps tens of millions) of dollars in costs that would have been needed to prepare for and carry out a long and highly complex criminal trial;

- Has taken full responsibility and expressed remorse, both in his public statements in open court and privately, at every stage of this case; and

- Placed himself at the mercy of this Court.

In the vast majority of federal prosecutions, there is a built-in incentive for a defendant to accept responsibility and plead guilty -- as Mr. Zambada has done, and Mr. Guzman did not. In the typical case, a defendant who pleads guilty and accepts responsibility will receive a substantially lesser sentence than a similarly situated defendant with a comparable record who puts the government to its burden, goes to trial and is convicted. The system is structured to achieve such a result; the U.S. Sentencing Guidelines were designed with this in mind as well.

Yet here, that is not the case. Notwithstanding their differing approach to resolve the charges against them, both Mr. Zambada and Mr. Guzman will receive the exact same sentence.

Although there will be no benefit in sentence, it seems reasonable there should be some consideration in terms of designation within the BOP. Since his arrival in the U.S. two years ago, Mr. Zambada has not been defiant or fought the system in any way. Despite being housed under the most stringent restrictions in 24-hour total isolation with no interaction with other inmates, he has never lodged any type of grievance or complaint nor requested any modifications of his conditions of confinement. This contrasts markedly with his co-defendant Chapo Guzman, and numerous other high-profile defendants housed at detention centers in this District who chafe under the highly restrictive Special Administrative Measures (SAMs).

The way that Ismael Zambada has conducted himself since coming to the United States is the way our system wants to encourage defendants to behave. Mr. Zambada's approach benefitted the system by reducing the logjam of justice. For Mr. Zambada to end up not only with the same life sentence as Mr. Guzman, but also in the same draconian Supermax prison, would fail to account in any way for the fact that he took the right path in resolving the charges against him. It would disincentivize other similarly situated defendants who are brought here in the future from following Mr. Zambada's example rather than Mr. Guzman's, and would seem somehow counterintuitive.

9.     *Letters of Support*

Several dozen letters of character reference have been received from individuals who grew up in the same area of Mexico as Mr. Zambada and have known him for years. These letters, in numerous instances, cite personal acts of helpfulness or generosity that Mr. Zambada has performed. Though not excerpted here nor attached, these letters, and their translations from Spanish into English, can be made available for review if either the Court or the prosecution should wish to see them.

10.  *Conclusion*

Defendant Ismael Zambada Garcia accepts that as a consequence of the serious crimes he has committed, he will be sentenced to prison for life.  He respectfully asks this Court to use its wisdom, experience, and familiarity with the inner workings of the Bureau of Prisons (BOP) to recommend incarceration at FMC Butner, FMC Rochester, MCFP Springfield, or some other appropriate medical facility within the BOP that has the capability to adequately assess and meet Mr. Zambada's needs for medical ███████ and correctional treatment, consistent with 18 U.S.C. §3553(a)(2)(D).

Respectfully submitted,

/s/*Frank A. Perez*
FRANK A. PEREZ
Attorney for Defendant
State Bar No. 00789541
9110 Scyene Rd.
Dallas, Texas  75227
Telephone: (214) 828-9911
Facsimile: (214) 828-2104
Email: fperez@frankperezlaw.com

FP:lt
enclosures

cc: Francisco J. Navarro via electronic mail